UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MATTHEW MARANA,
     Petitioner,

vs.                            Case No.:  3:20cv5423/LAC/EMT

FLORIDA DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Matthew Marana (Marana) filed a counseled amended habeas petition under 28 U.S.C. § 2254 (ECF No. 3).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 9).  The court provided Marana an opportunity to file a reply (*see* ECF Nos. 10, 12), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that Marana is not entitled to federal habeas relief.

I.     RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 9).[1]  Marana was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-3013, with one count of using a computer to facilitate or solicit a parent, legal guardian, or custodian to consent to the sexual conduct of a child (Count 1), one count of unlawful use of a two-way communications device to facilitate the commission of a felony (Count 2), one count of traveling to meet a minor to engage in sexual conduct with consent by a parent, legal guardian, or custodian (Count 3), and one count of attempted lewd and lascivious battery (victim over 12 but under 16 years of age) (Count 4) (ECF No. 9-1 at 54–55 (Information)).  Marana filed a Motion to Dismiss Count Four (ECF No. 9-1 at 82–84 (motion)), a Motion to Dismiss Count One and Count Three (*id.* at 85–87 (motion)), and a Motion to Dismiss Entrapment as a Matter of Law, with attachments and a supporting memorandum (ECF No. 9-2 at 4–12 (motion), ECF No. 9-2 at 13 through ECF No. 9-3 at 141 (attachments), ECF No. 9-3 at 142–45 (memorandum)).  The trial court held a hearing on the motions to dismiss and

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

Case No.:  3:20cv5423/LAC/EMT

denied them (ECF No. 9-4 at 4–46) (transcript of motion hearing)); ECF No. 9-5 at

199, 200 (orders denying motions to dismiss)).

On January 17, 2012, Marana and the State entered a written plea and sentence

recommendation (Plea Agreement) (ECF No. 9-6 at 6–11 (Plea Agreement)).

Marana agreed to plead guilty to Counts 1 and 3 (and to five counts of violating his

probation in three other cases), and the State agreed to nolle pros Counts 2 and 4

(*id.*).  Marana agreed that the factual basis for the plea was set out in the arrest report,

offense report, or probable cause affidavit (*id.*).  There was no agreement between

the parties as to sentencing on Counts 1 and 3 (*id.*).

At a hearing on December 12, 2014, the trial court conducted a colloquy with

Marana and then accepted his plea as freely, knowingly, and voluntarily entered

(ECF No. 9-7 at 4–25 (transcript of plea hearing)).[2]  The parties agreed that Marana

reserved his right to appeal the trial court's denial of the motions to dismiss, and that

the motions were dispositive (*id.*).  The trial court adjudicated Marana guilty and

sentenced him, as a sex offender, to a "split" sentence of thirteen years in prison

followed by two years of sex offender probation on Count 3, and five years of

probation on Count 1, to run consecutive to the probation in Count 3 (*id.* at 27–34

(Judgment)).  Marana received sentence credit for all time served (*id.*).

---

[2] The intervening procedural history is not relevant to disposition of Marana's § 2254 petition.

Marana filed a motion to correct sentencing error pending appeal, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (ECF No. 9-9 at 4–6 (Rule 3.800(b)(2) motion)). The State conceded the sentencing error (*id.* at 21 (State's response)). The court granted Marana's Rule 3.800(b)(2) motion and resentenced him, as a sex offender, to a "split" sentence of twelve years in prison followed by three years of sex offender probation on Count 3, with credit for all time served (*id.* at 26–27 (order granting Rule 3.800 motion), *id.* at 28–34 (amended Judgment)). The court did not reimpose a sentence on Count 1.

Marana appealed the judgment and sentence to the Florida First District Court of Appeal (First DCA), Case No. 1D14-5829 (ECF No. 9-11 (Marana's initial brief), ECF No. 9-12 (State's answer brief); ECF No. 9-13 (Marana's reply brief)). On August 14, 2017, the First DCA affirmed the conviction without additional discussion, but reversed and remanded for a resentencing hearing (ECF No. 9-14 at 2–3 (opinion)). *Marana v. State*, 226 So. 3d 329 (Fla. 1st DCA 2017) (Mem). The mandate issued October 17, 2017 (*see* ECF No. 9-15 at 2 (docket)). In a judgment rendered on April 24, 2019, the trial court resentenced Marana, as a sex offender, to a "split" sentence of 138 months in prison followed by 42 months of sex offender probation on Count 3, with credit for all time served (ECF No. 9-17 at 36–42 (Judgment)).

Marana's counsel commenced this federal habeas action on May 24, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[3]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

---

[3] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . .  because it was meant to be." *Richter*, 562 U.S.

at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244).  It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents.  It goes no
> further.  Section 2254(d) reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal justice systems," not
> a substitute for ordinary error correction through appeal. *Jackson v.
> Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (Stevens, J., concurring in judgment).  As a condition for
> obtaining habeas corpus from a federal court, a state prisoner must
> show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any possibility
> for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a

petitioner's claim only if it first finds that the petitioner satisfied § 2254(d).  *See*

*Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).  Even then, the petitioner must

show that he is in custody "in violation of the Constitution or laws and treaties of the

United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in

"actual prejudice," meaning, the error "had a substantial and injurious effect or

influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III.  MARANA'S CLAIM

**"The conduct of law enforcement in this case violated Mr. Marana's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution."**

Marana alleges the undisputed evidence shows that law enforcement created the situation that resulted in his being charged with traveling to meet a minor to engage in sexual conduct (*see* ECF No. 3 at 13–16).  Marana alleges law enforcement placed an advertisement on Craigslist in the Casual Encounter section, a section specifically designed for adults and which prohibits individuals under the age of 18 from using it.  Marana alleges the ad did not include any reference to a minor but was titled, "Sisters looking for a hot night - w4m - 19."  Marana alleges the body of the ad also failed to reference anyone under the age of 18.  He alleges the ad stated, "2 sisters seeking a man that handle [sic] both of us.  We are ready for a hot night, are you?"  Marana alleges only after he made an initial response to the ad did law enforcement represent that the imaginary younger sister was 14-years of age.  He alleges law enforcement immediately offered him a sexually willing 14-year-old girl.  Marana alleges in response, he did not immediately agree to engage in sexual activity, but repeatedly expressed reluctance in engaging in sexual activity

with someone who was not an adult.  Marana alleges throughout the ensuing email conversations, the undercover officer (Detective McCray) posing as the adult sister indicated a willingness for the adult sister to be involved in sexual conduct with him.

Marana alleges Detective McCray sent two pictures which purportedly depicted both the adult 19-year old sister and the 14-year old sister, but actually depicted two Pensacola police officers who were over the age of 21.  Marana alleges even the prosecutor agreed that the pictures depicted "two women who clearly look like they're over 21."  Marana alleges Detective McCray used the photographs of adult women to convince him to travel to the undercover residence, even after he expressed reluctance about engaging in sexual activity with a 14-year old.

Marana contends law enforcement knowingly and purposefully used the lure of sex with two adult females, and should have ceased their undercover operation as soon as he expressed reluctance to engage in sexual activity with a minor.  Marana further alleges the undercover officer pressured him to tell her what he intended to do with the "two of them" instead of letting him set the tone, pace, and subject matter of the conversation, as required by the federal operational and investigative standards for these types of investigations.

Marana contends the methods of law enforcement were not directed only at the apprehension of individuals involved in ongoing criminal activity.  He argues

the methods and tactics originated a criminal design, implanted the disposition to commit a criminal act, and then induced the commission of the crime so that the State could prosecute.  Marana contends the conduct of law enforcement is in clear and direct contravention of the United States Supreme Court's decisions in *Rochin v. California*, 342 U.S. 165, 169 (1952), *United States v. Russell*, 411 U.S. 423, 431–32 (1973), and *Jacobson v. United States*, 503 U.S. 540, 548 (1992).  He contends the state courts' rejection of his due process claim constitutes an unreasonable application of those Supreme Court decisions.

The State contends the state court's adjudication of Marana's due process claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (ECF No. 9 at 11–22).

## 1.    Clearly Established Federal Law

This section discusses each of the Supreme Court cases cited by Marana as the "clearly established Federal law" governing his claim, for purposes of § 2254(d)(1).

In *Rochin*, the Supreme Court considered whether Rochin's due process rights were violated when officers, who had some information that Rochin was selling narcotics, entered an open door of his home, forced open the door to his bedroom,

forcibly attempted to extract capsules which he had swallowed, and then took him

to the hospital and had his stomach pumped.  342 U.S. at 166.  The Court held:

> This is conduct that shocks the conscience.  Illegally breaking into the
> privacy of the petitioner, the struggle to open his mouth and remove
> what was there, the forcible extraction of his stomach's contents—this
> course of proceeding by agents of government to obtain evidence is
> bound to offend even hardened sensibilities.  They are methods too
> close to the rack and the screw to permit of constitutional
> differentiation.

342 U.S. at 172.  The Court expressly limited its holding to the facts of the case,

where officers used "force so brutal and so offensive to human dignity in securing

evidence from a suspect . . . ."  *Id.* at 174.  The Court "put to one side cases which

have arisen in the State courts through use of modern methods and devices for

discovering wrongdoers and bringing them to book."  *Id.*

In *Russell*, the Supreme Court considered whether Russell's due process rights

were violated by the following conduct of an undercover officer:

> Joe Shapiro, an undercover agent for the Federal Bureau of Narcotics
> and Dangerous Drugs, went to [Russell's] home . . . where he met with
> [Russell] and his two codefendants, John and Patrick Connolly.
> Shapiro's assignment was to locate a laboratory where it was believed
> that methamphetamine was being manufactured illicitly.  He told
> [Russell] and the Connollys that he represented an organization in the
> Pacific Northwest that was interested in controlling the manufacture
> and distribution of methamphetamine.  He then made an offer to supply
> the defendants with the chemical phenyl-2-propanone, an essential
> ingredient in the manufacture of methamphetamine, in return for one-
> half of the drug produced.  This offer was made on the condition that

Agent Shapiro be shown a sample of the drug which they were making and the laboratory where it was being produced.

During the conversation, Patrick Connolly revealed that he had been making the drug since May 1969 and since then had produced three pounds of it. John Connolly gave the agent a bag containing a quantity of methamphetamine that he represented as being from "the last batch that we made." Shortly thereafter, Shapiro and Patrick Connolly left [Russell's] house to view the laboratory which was located in the Connolly house . . . . At the house, Shapiro observed an empty bottle bearing the chemical label phenyl-2-propanone.

By prearrangement, Shapiro returned to the Connolly house on December 9, 1969, to supply 100 grams of propanone and observe the manufacturing process. When he arrived he observed Patrick Connolly and [Russell] cutting up pieces of aluminum foil and placing them in a large flask. There was testimony that some of the foil pieces accidentally fell on the floor and were picked up by [Russell] and Shapiro and put into the flask. Thereafter, Patrick Connolly added all of the necessary chemicals, including the propanone brought by Shapiro, to make two batches of methamphetamine. The manufacturing process having been completed the following morning, Shapiro was given one-half of the drug and [Russell] kept the remainder. Shapiro offered to buy, and [Russell] agreed to sell, part of the remainder for $60.

About a month later, Shapiro returned to the Connolly house and met with Patrick Connolly to ask if he was still interested in their "business arrangement." Connolly replied that he was interested but that he had recently obtained two additional bottles of phenyl-2-propanone and would not be finished with them for a couple of days. He provided some additional methamphetamine to Shapiro at that time. Three days later Shapiro returned to the Connolly house with a search warrant and, among other items, seized an empty 500-gram bottle of propanone and a 100-gram bottle, not the one he had provided, that was partially filled with the chemical.

411 U.S. at 425–26 (footnotes omitted).

The Supreme Court, noting that Agent Shapiro contributed a chemical to the criminal enterprise already in process, that the chemical was by itself a harmless substance, that its possession was legal, and that it was obtainable, held that Shapiro's conduct was "not so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," and that the conduct "stop[ped] far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment."  411 U.S. at 431–32 (citing *Rochin* and *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960) as distinguishing cases).

In the third Supreme Court case relied upon by Marana, *Jacobson v. United States*, the Supreme Court considered whether the Government adduced sufficient evidence at trial to support the jury's verdict that Jacobson was disposed to commit the criminal act prior to being approached by government agents.  503 U.S. at 548– 49, 554.  At a time when federal law permitted such conduct, Jacobson ordered and received two Bare Boys magazines containing photographs of nude preteen and teenage boys.  *Id.* at 542–43.  Later, after the receipt through the mails of sexually explicit depictions of children had become unlawful, the Government searched and found Jacobson's name on the bookstore mailing list.  *Id.* at 543–44.  Agents then sent Jacobson mail through five fictitious organizations and a bogus pen pal, to

explore his willingness to break the law. *Id.* at 544–47. Many of those organizations represented that they were founded to protect and promote sexual freedom and freedom of choice and that they promoted lobbying efforts through catalog sales. *Id.* Jacobson responded to some of the correspondence. *Id.* After 2 ½ years on the Government mailing list, Jacobson was solicited to order child pornography. *Id.* at 546. Jacobson answered a letter that described concern about child pornography as hysterical nonsense and decried international censorship, and then received a catalog and ordered a magazine depicting young boys engaged in sexual activities. *Id.* at 546–47. He was arrested after a controlled delivery of the magazine, but a search of his house revealed no materials other than those sent by the Government and the Bare Boys magazines (which were legal at the time Jacobson ordered and received them). *Id.* at 547. The jury rejected Jacobson's entrapment defense and convicted him, thus finding that the Government proved beyond a reasonable doubt that he was predisposed to commit the crime. *Id.*

The Supreme Court reversed Jacobson's conviction, concluding that the prosecution had failed to adduce evidence that Jacobson was predisposed, independent of the Government's actions, because Jacobson was not simply offered the opportunity to order pornography, he was the target of 26 months of repeated Government mailings and communications. 503 U.S. at 540–41. The Court stated:

There can be no dispute about the evils of child pornography or the difficulties that laws and law enforcement have encountered in eliminating it. *See generally Osborne v. Ohio*, 495 U.S. 103, 110, 110 S. Ct. 1691, 1696, 109 L. Ed. 2d 98 (1990); *New York v. Ferber*, 458 U.S. 747, 759–760, 102 S. Ct. 3348, 3355–3356, 73 L. Ed. 2d 1113 (1982). Likewise, there can be no dispute that the Government may use undercover agents to enforce the law. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441, 53 S. Ct. 210, 212, 77 L. Ed. 413 (1932); *Sherman [v. United States]*, 356 U.S. [369,] 372, 78 S. Ct. [819,] 820[, 2 L. Ed. 2d 848 (1958)]; *United States v. Russell*, 411 U.S. 423, 435-436, 93 S. Ct. 1637, 1644–1645, 36 L. Ed. 2d 366 (1973).

. . . .

Law enforcement officials go too far when they "implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. U.S.*, 287 U.S. 435, at 442, 53 S. Ct. 210, at 212–213, 77 L. Ed. 413 (emphasis added). . . . When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.

[W]e conclude that this is such a case and that the prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that petitioner was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law by receiving child pornography through the mails, . . .

503 U.S. at 548, 553–54.

## 2.    Federal Review of State Court Decision

Marana presented his federal due process claim to the trial court in his Motion

to Dismiss Entrapment as a Matter of Law, exhibits, and supporting memorandum

(ECF No. 9-2 at 4–2 (motion), 9-3 at 142–44 (memorandum)).  The trial court held a hearing on the motion, as well as other defense motions (ECF No. 9-4 at 4–45). The parties relied upon documentary evidence submitted with their respective pleadings, which were made part of the record (ECF No. 9-4 at 48 through 9-5 at 197).  The judge stated she reviewed the materials prior to the hearing (ECF No. 9-4 at 5).

The following facts are not in dispute.  On June 23, 2011 at 7:11 p.m. (CST), Detective McCray, posing as 19-year old "Amber," posted a Craigslist ad in the Casual Encounter's section titled "Sisters Looking for a Hot Night-w4m-19.[4]" (ECF No. 9-4 at 134).  The ad stated, "2 sisters seeking a man that handle [sic] both of us. We are ready for a hot night, are you?" (*id.*).  Marana responded at 7:55 p.m., and the communications between "Amber" and Marana continued until approximately 2:16 a.m. the next morning (*see* ECF No. 9-4 at 152 through 9-5 at 86).  The parties agree that the relevant parts of the communications are the following (verbatim):

> Marana:    I can handle you both. I've handled plenty of 3somes before.  I'm 27 y/o, 5'6" hwp, and have a 7 .5" cock. I can host.  Wanna play.
>
> "Amber":   Wow!!!  Experienced!!!!  We like it!  Actually we host only. My lil sis is in town visiting me for the summer.  She is 14, you ok with that?

---

[4] According to Detective McCray's deposition testimony, which is part of the state court record, "w4m-19" means woman for man, age 19.

Marana:      How old are you?

"Amber":     I am19.  U

Marana:      I'm 27.  Have you and your sister done stuff together before?

Marana:      Hello?

"Amber":     Hey!  We are here.  We did this once before during Christmas and had a blast!!!  Have u ever done this

Marana:      I've done 3somes before . . . but both girls were over 18 everytime.  Do you have a pic of you two?

"Amber":     Great, you have experience!!!  My name is Amber and I am 19, Eric is 14. [photo of two women attached (ECF No. 9-4 at 157)]

Marana:      Who is who in the pic?

"Amber":     Oh sorry.  I am in the brown tube top, and erin is in the bikini.  What do you think?

Marana:      Well you are both sexy . . . but I'm a little weirded out about her being 14.  Like I said, every 3some I've done the girls have both been adults.

"Amber":     Oh well if you don't want to we can understand. We will find someone else

Marana:      I didn't say I wasn't considering it. Just it's dangerous for me.  What if you guys were to turn around and go to the cops?

"Amber":     Ahh, hello.  Do you know how much trouble i could get in. She is my sis and 14

Marana:       This is true.  But I could go to prison.

"Amber":      yeah, me too.  Just dont bring the cops with u

Marana:       I wouldn't.  As long as you don't have them waiting.

"Amber":      waiting???  they r definitely not waiting, thats crazy

Marana:       Well. . . . I'm still apprehensive.

"Amber":      Gotcha.  Dont know what else to say

Marana:       Idk. . . . more incentive?

"Amber":      like what

Marana:       Idk. . . . Well how about we talk for a bit first?

Marana:       Wanna text and get to know each other before we decide to do this? If I do decide.

Marana:       You there Amber?

Marana:       Amber?  You not wanting to talk anymore?

"Amber":      We are here sry

Marana:       Where did you guys disappear to?

"Amber":      just hanging out! u
              . . .

Marana:       Got more pics of you two?

"Amber":      Just the two of us here!  She is really here as long as she wants, until school starts back!  I have pix, do u have more

Marana:     I got a couple more. . . . I also have "special" ones.

"Amber":    Nice! Lets see em

Marana:     Well what kind of pics u got?

"Amber":    We have reg pix and "special" ones of us!!!!!

Marana:     Well I've now sent two and only gotten one.  I think it's a good time for a pic for pic.

"Amber":    Here is another one [photo of two women attached (ECF No. 9-4 at 201)]

Marana:     Are you tightening her bikini top or trying to take it off? lol.  And do you both like what you see?  Would this be a one time deal?

"Amber":    If you must know, Mr. Curious, I was actually taking it off!!!  We do like what we see!!!  Do you like what you see?  If we get together and have and amazing time, then I sure we could make this a reg until she leaves

Marana:     And why were you taking it off?  I definitely like what I see.  Got another?  And regularity sounds good for me.

"Amber":    Sounds like you are a pix whore!!!

Marana:     I just like seein a lot of who I'm hooking up with.  I can send you some of my special ones.

"Amber":    You still have [not] told us what you like.  Sounds like you dont like to be in control. Lets see 'em

Marana:     I never said I don't like being in control.  I can take charge when the situation calls for it.  Did you get the one I just sent?  Like it? Wanna hang tonight?

"Amber":    We do like it, but not hanging until u tell us what u have in store for the two of us.  We want to hear it

Marana:    I prefer to just let the situation dictate what's gonna happen.  But I know that we would start making out with each other, me with you, me with her, and you with her.  Then we would all start taking each other's clothes off, stopping to make out some more as we do.  Then I would love to eat one of you out, while the other gives me a bj.  Sound good so far?

"Amber:"    That's what we are talking about, got more

Marana:    Why don't we get together and write the rest of the story together?

"Amber":    Lets do it!!!  U have us all excited!  Where are u?

Marana:    Up near UWF.  Where are you?

"Amber":    We are by the mall and airport.  How long will that take?

Marana:    Bout 15, 20 minutes.

"Amber":    Thats not far at all.  We need to hop in the shower.  Can you give us a few

Marana:    I need to hop in the shower too. . . .We could clean each other.

"Amber":    Y have u not left ur apartment. that's nasty. u need to shower

Marana:    Do you want me to shower here first?  Or should we all shower together?

"Amber":    U need to shower there first. especially if you have not showered in a couple of days. scrub really well

Marana:      I will.  Where exactly am I going to?

"Amber":     We r hopping in. hit u back shortly

Marana:      I'm all clean.

"Amber":     almost ready

Marana:      So where am I going exactly?

"Amber":     Do u have a number I can call

Marana:      Why do you need to call?  Can't you just gimme your address and I come by to hang?

"Amber":     We can do that but r u ready? did u shower and r u all clean for us

Marana:      All clean. I even shaved my face too!

"Amber":     Did u shave anything else

Marana:      No. I'm a little scruffy down there, but not too bad.

"Amber":     we can work on that

Marana:      Oh really?

Marana:      So you gonna give me your address?  Or do you wanna wait and do this tomorrow since it is getting a little late at night.  We can have more time if we start early tomorrow.

"Amber":     yeah we can do tomorrow.  We were looking forward to tonight, but I guess we can wait

Marana:      It's up to you two.  I would love to do it tonight.

"Amber":    u seem like u r backin out on us

Marana:    You two seem slow to respond.  Are you guys falling asleep over there?

"Amber":    We r trying not to!  We can be ready if u r coming

Marana:    So where am I going to?

"Amber":    3755 Potosi Rd
Do u know where that is?  How long will that take?
Dont forget the rubbers for sis

Marana:    It's gonna be about 15 minutes.  I'm on my way now. Ready for me?

Marana:    You're off Hibiscus right?

"Amber":    yes

Marana:    Ok. On my way.

"Amber":    U finding it ok

(ECF No. 9-4 at 152 through 9-5 at 86).  Marana arrived at the house and was arrested.

After hearing arguments from the parties, the trial court orally denied the Motion to Dismiss Entrapment as a Matter of Law without stating reasons (ECF No. 9-4 at 29).  The trial court requested that defense counsel prepare proposed orders, and counsel agreed (*id.* at 42).  The court's written order on Marana's Motion to Dismiss Entrapment as a Matter of Law stated the following:

**THIS CAUSE** having come on for hearing before the Court on November 21, 2011 on Defendant's Motion to Dismiss, Entrapment as a Matter of Law pursuant to Rule 3.190(b)(c), both Defendant and State agreeing that the facts are not in dispute, the Court being fully advised in all the premises and having considered the same, as well as the enclosures #1–10, which were renumbered as defense exhibits, the Court having also considered all exhibits and having reviewed all the exhibits including viewing Exhibit 4 which is a DVD containing a video of the arrest of Defendant, Defendant's statement, and all emails; the Court finds that there are no factual dispute [sic].

Based upon the evidence and argument of counsel, the Court finds that the charges should not be dismissed as a matter of law.

(ECF No. 9-5 at 199).

Marana presented the federal due process claim as Issue I of his initial brief on direct appeal (ECF No. 9-11at 16–20).  Marana did not directly cite any federal cases, but he cited decisions from Florida state courts, including the Florida Supreme Court, which relied upon federal due process principles (*id.*).  The First DCA affirmed the conviction without providing reasons for its decision.  *See Marana*, 236 So. 3d at 329.

Where, as here, neither the trial court's nor the appellate court's decision on the merits of the petitioner's federal claim came accompanied with the state court's reasons, the petitioner must show that there was no reasonable basis for the state court's decision.  *See Richter*, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's

decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See id.* at 102. If it is possible that fairminded jurists could disagree, this potential for disagreement precludes the court from granting habeas relief on this claim. *See Richter*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents"); *see also Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."); *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1127 (11th Cir. 2012) (same); *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 910 (11th Cir. 2011) (same).

Marana contends his expressed apprehension, when he learned that the younger sister was a minor, demonstrates he was not predisposed to commit the crime. He contends this evidence shows that Detective McCray implanted the criminal disposition and induced commission of the crime.

Marana's argument ignores the evidence that when he first expressed apprehension (i.e., that he was "weirded out" by the younger sister's age), Detective McCray gave Marana an out, stating, "Oh well if you don't want to we can understand. We will find someone else." Instead of terminating the conversation, Marana responded, "I didn't say I wasn't considering it. Just it's dangerous for me." Marana then expressed concern that the girls would "go to the cops" or "have them waiting," and that he could "go to prison." In response, Detective McCray again gave Marana an out, stating, "Gotcha. Don't know what else to say." But instead of opting out, Marana did the opposite. He asked for "more incentive" and suggested they continue the conversation. Detective McCrary didn't respond to Marana's suggestion, so Marana sent another communication. McCrary again didn't respond, so Marana sent a third communication. McCrary still didn't respond, so Marana sent a fourth communication. McCrary responded, but said simply, "We are still here." Marana then continued his pursuit of the sexual encounter with "Amber" *and* her 14-year old sister, asking for more pictures, sending his own "special" ones, and then suggesting that he travel to their location to "hang out" that evening.

Rather than suggesting lack of criminal disposition, Marana's pursuing the sexual encounter with a minor after acknowledging its illegality suggests the opposite, i.e., his criminal predisposition and criminal intent. *See United States v.*

*Farley*, 607 F.3d 1294, 1334 (11th Cir. 2010) (noting that defendant's criminal intent was demonstrated by his repeated acknowledgement of "his awareness that what he planned to do was highly illegal"); *United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) (holding that a reasonable jury could have found from defendant's "constant concern" for whether the adult with whom he was communicating (an undercover agent) was conducting a sting, that the defendant was interested in more than a platonic relationship with the minor offered by the agent, because a relationship with the adult with whom defendant was communicating would not have concerned law enforcement); *see also, e.g., United States v. Unrein*, 688 F. App'x 602, 610 (11th Cir. 2017) (defendant's concern that decoy was an officer conducting a sting operation does not demonstrate the Government's pushing the plan on him; it demonstrates his criminal intent) (unpublished but cited as persuasive authority).

Marana additionally contends the fact that he acted on photographs of females who looked like adults and actually were adults indicates he desired and intended to have sex with only adults. However, his argument ignores the evidence that Detective McCrary repeatedly told him that one of the females in the pictures was a minor and made clear that the minor was going to participate in the sexual encounter.

Marana has not demonstrated that the First DCA's rejection of his federal due process claim was an unreasonable application of the holding of any Supreme Court decision he cited. This case did not involve a forceful physical intrusion on the individual's privacy and person by law enforcement, which is what the Supreme Court found "shocke[ed] the conscience" in *Rochin*.

Further, this case did not involve a months-long campaign of law enforcement's targeting a specific individual with repeated offers to engage in illegal conduct and pressure to do so, which is what the Supreme Court found unconstitutional in *Jacobson*. Rather, Detective McCray simply offered an opportunity to commit the offense, using deceit as a technique, and then waited until Marana contacted her. Then, without pressure from McCray, Marana actively solicited a sexual encounter with a 14-year old and traveled for the purpose of engaging in it.

With respect to *Russell*, the Supreme Court found that law enforcement's conduct in that case was *not* unconstitutional, so it does not support Marana's claim.

A reasonable jurist could conclude that law enforcement's conduct in Marana's case was not the type of overreaching or outrageous misconduct that the

Supreme Court has recognized as violative of the Due Process Clause.[5]   Therefore,

Marana is not entitled to federal habeas relief.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States

District Courts provides that "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the

only question is whether the applicant has shown that 'jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to

---

[5] The Eleventh Circuit has acknowledged "outrageous government conduct" as a "potential defense" but has not adopted the defense and noted that it has never succeeded in this Circuit.  *See United States v. Cannon*, — F.3d —, 2021 WL 374524, at *10 (11th Cir. Feb. 3, 2021) (citations omitted).

proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773  (2017) (citing *Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.   Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the habeas petition (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 2$\underline{^{nd}}$ day of March 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

       **Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**